## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

EILEEN KATES,
     Plaintiff,

                                 Case No.:  8:22-cv-342

v.


CHRIS NOCCO, In His Official
Capacity As Pasco County Sheriff,
     Defendant.
_____/

## PLAINTIFF'S COMPLAINT FOR DAMAGES DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

Ms. Eileen Kates ("Ms. Kates") has been targeted, continuously and systematically harassed and punished, in violation of her First, Fourth and Fourteenth Amendment Rights, by the Pasco County Sheriff's Office ("PCSO") under an official PCSO policy and program predicated on predictive policing and predatory tactics.  PCSO has adopted and implemented a self-titled "Intelligence-Led Policing Program" ("ILP Program") which attempts to predict future criminal offenders. The ILP Program identifies "prolific offenders" based upon a crude algorithm created by the PCSO. These individuals and their families are subjected to harassment, pretextual and arbitrary law enforcement, and baseless punishment. PSCO's arrogant assumption that it can use the ILP Program to predict future crime

flies in the face of both science and common sense. The actual purpose of the ILP Program is to force citizens with prior criminal records to move. PSCO's implementation of the ILP Program is unconstitutional and has turned Pasco County into an Orwellian hellscape for Ms. Kates and her family

## PARTIES

### Plaintiff Eileen Kates

1.    Plaintiff Eileen Kates resides in Pasco County, Florida, with her daughter, and two minor grandchildren.

2.    Ms. Kate's 32-year-old son Ryan Kates ("Ryan") also resides in Pasco County with Ms. Kates.

3.    Ryan moved back in with his mother recently but was not staying with her at the time the PCSO began targeting her home.

4.    Ryan served a two-month jail sentence for aggravated stalking and successfully completed probation in January of 2021.

5.    Ryan became a target of the PCSO ILP Program as detailed below.

6.    Beginning on the weekend of March 13, 2021, PCSO deputies began conducting "Prolific Offender Checks" at Ms. Kate's home looking for Ryan.

7.    At the direction of Chris Nocco and guided by a rudimentary algorithm, PSCO has systemically harassed Ms. Kates and her family, violating her First, Fourth, and Fourteenth Amendment rights.

## Defendant Pasco County Sheriff Chris Nocco

8.      Chris Nocco is the acting Sheriff of Pasco County, Florida.

9.      Sheriff Nocco has held the position of Sheriff in Pasco County since 2011 without interruption.

10.     Sheriff Nocco is sued in his official capacity as Sheriff of Pasco County.

11.     Sheriff Nocco created the ILP Program and spearheaded its implementation in Pasco County.

12.     Sheriff Nocco is responsible for every aspect of the ILP Program, from its directives to its implementation, including its explicit protocols and its accepted customs.

13.     Sheriff Nocco prepared the ILP Manual which establishes the policies, practices, administration, and enforcement guidelines for the ILP Program.

14.     The Pasco County budget funds the PCSO, and Pasco County ultimately bears financial responsibility for judgments against the Sheriff of Pasco County in his official capacity.

## JURISDICTION AND VENUE

15.     Plaintiff Eileen Kates brings this civil rights lawsuit pursuant to 42 U.S.C. § 1983 for violations of the First, Fourth, and Fourteenth Amendments to the U.S. Constitution stemming from Defendant's authorization and implementation of the PCSO's ILP Program.

16.     Plaintiff seeks declaratory and injunctive relief against Defendant to bar further implementation of the Program due to the fact that the ILP Program, as currently constituted and enforced, involves strategies and policies that violate the First, Fourth, and Fourteenth Amendments to the U.S. Constitution.

17.     Plaintiff seeks compensatory and nominal damages from Defendant for the harms caused by Defendant as a direct and proximate result of Defendant's authorization and implementation of the Program.

18.     This Court has jurisdiction under 28 U.S.C. §§ 1331, 1343, 2201, and 2202.

19.     Venue is proper in this Court under 28 U.S.C. § 1391.

## FACTUAL ALLEGATIONS

20.     Sheriff Nocco, in his official capacity as Sheriff of Pasco County has developed, authorized, and implemented the ILP Program as an official program of the PCSO.

21.     The ILP Program dictates the strategy, tactics, goals and allocation of resources for the PCSO generally as well as deputies and command staff specifically.

22.     As the name indicates, Sheriff Nocco promotes the "Intelligence-Led" Policing Program as an advancement in policing based on analytics. The ILP Program utilizes some objective data regarding criminal history but is heavily reliant upon subjective data generated internally to select individual "targets" which the

PCSO feels are more likely to commit future offenses, and on whom the PCSO should focus a disproportionate amount of resources and effort.

23.    Sheriff Nocco's defense of the ILP Program is often contradictory, at once boasting the ability to reduce crime by identifying likely future offenders and focusing resources upon these 'targets,' and at the same time disavowing the concept of predictive policing.

24.    In describing the ILP Program, Sheriff Nocco himself has referenced the film Minority Report, a science fiction movie in which a pre-crime division, acting on the premonitions of oracles, pursue and apprehend individuals for future crimes they are destined to commit.

25.    Once an individual becomes an official target of the ILP Program, PCSO deputies begin to focus their efforts on the individual, collecting as much information as possible, monitoring and tracking the individual's whereabouts and associations, and conducting 'Prolific Offender Checks' with the target frequently as a show of force and deterrent.

26.    While the official Program Manual requires quarterly "checks," the custom and practice of the PCSO is often to conduct these visits one or more times per week.

27.   These visits can and often do continue for years, effectively making Pasco County a living hell for any "target," or anyone associated with a "target," such as family members like Ms. Kates.

28.   The ILP Program requires PCSO deputies to gather as much information on targets and their associates as possible, and takes direct aim at any person associated with a target as a further source of information and/or cooperation against targets. Family members are often the most vulnerable of these associates.

29.   The ILP Program directs deputies to conduct "Prolific Offender Checks" at the homes of family members, even when the target does not reside there.

30.   These checks at the homes of family members are often as frequent as they are for the targets themselves. Ms. Kates has been subjected to myriad "Prolific Offender Checks."

31.   Associates and family members who refuse to cooperate with deputies are often subjected to the same unconstitutional tactics and practices utilized against targets, including but not limited to, warrantless searches of property and pretextual code enforcement.

32.   The ILP Program encourages unrelenting and warrantless search and seizure of citizens without probable cause, for the purpose of harassment and forced compliance or cooperation, in direct contravention of the Fourth Amendment of the US Constitution.

33.     ILP Program searches and seizures are meant to punish individuals, including family members, for choosing to associate with ILP Program targets, and for refusing to assist PCSO against ILP Program targets, in direct contravention of the First Amendment of the US Constitution.

34.     Selective Code enforcement is used as a pretext for further intrusion, intimidation, harassment, coercion and punishment, in direct contravention of the Due Process and Equal Protection Clauses of the Fourteenth Amendment of the US Constitution.

### PCSO Continuously and Systematically Conduct Warrantless Searches of Family Residences to Gather Information.

35.     PCSO deputies identify the homes of their target's family members and begin to conduct regular 'Prolific Offender Checks' for their target at the family residences, regardless of whether the targets actually reside there or not.

36.     Beginning on the weekend of March 13, 2021, PCSO deputies began conducting "Prolific Offender Checks" at Ms. Kates home looking for her son.

37.     PCSO deputies repeatedly make unannounced visits, at unreasonable hours, to the homes of ILP Program targets and the homes of their family members.

38.      These visits consist of warrantless searches of property, demands to search residences without a warrant, and demands for information regarding the whereabouts of targets that have been identified as likely future offenders under the ILP Program.

39.     PCSO deputies physically intrude on the curtilage of family member homes in an effort to gather information in their investigations of targets and criminal activity.

40.     On March 20, 2021, PCSO deputies returned to Ms. Kates home between 4 and 5 AM banging on doors and windows until Mr. DeSimone, Ms. Kates' husband at the time, answered. Deputies told Mr. DeSimone that they were looking for Ryan. Deputies were informed that Ryan did not reside there at the time. After Mr. DeSimone asked deputies to leave the property, they began collecting information for the cars on the property.

41.     On March 21, 2021, at around 2AM, several PCSO deputies returned yet again to Ms. Kates's home in what quickly became a patently clear attempt to harass and intimidate. PCSO deputies proceeded to search the curtilage of the home, patrolling the backyard, walking around the screened lanai, and peering into the home, using flashlights to aid their search. After banging loudly on the door and startling Ms. Kates and her family, PCSO deputies again asked for Ms. Kates's son. Ms. Kates again informed deputies that Ryan did not reside there, and repeatedly asked deputies to leave her property, but deputies did not acquiesce for some time.

42.     Ms. Kates told the deputies that their behavior amounted to harassment and if they kept showing up without a warrant, she would have to call the cops to report them. One deputy responded "we are the cops" while another deputy told Ms.

Kates that if she called 911 on them, she would be arrested. Ms. Kates responded that she knew her rights to which PCSO Deputy Hamilman, responded "yup your rights will get you dead and arrested." Deputies then turned their attention to collecting vehicle information and discussing what citations they could give Ms. Kates regarding a vehicle on her property.

43.     These ILP Program mandated visits and warrantless searches are not responsive to any calls to police nor predicated on reasonable suspicion of related criminal activity. The visits and searches recur despite residents' explicit requests for officers to leave and their stated desire to cease interacting with the police, including Ms. Kates.

44.     PCSO deputies repeatedly demand access to the inside of the home to search for their targets. Even if targets are not present, PCSO deputies demand information on the whereabouts of targets. Even when both demands are refused, and residents explicitly inform deputies that they are not welcome, the warrantless searches continue, often multiple times a week.  Ms. Kates has suffered from this ILP Program mandated behavior.

45.     Ms. Kates has repeatedly informed deputies that they are not welcome and has asked them not to return without a warrant. PCSO deputies refuse to terminate any given interaction upon Ms. Kates's demand, continue to attempt to coerce consent to search Ms. Kates's home, and refuse to cease the warrantless

searches of her property. PCSO deputies have regularly conducted warrantless searches of Ms. Kates's property, sometimes including multiple searches a week, gaining visuals of activity within the home and its curtilage which they could only obtain while standing within the curtilage of the home.

46.     These warrantless searches include night-time searches in which deputies walked around her backyard and attempted peering into the home without ever announcing their presence.

47.     PCSO deputies have made it clear that their protocol is to continue to harass individuals until they cooperate.

48.     On one occasion, PCSO deputies refusing to leave Ms. Kates's property when instructed, told Ms. Kates that to "make it easy" she should cooperate by having her son turn himself in. On other occasions, they have promised Ms. Kates that the unwanted visits would continue.

## PCSO Utilize Arbitrary and Pretextual Code Enforcement to Punish and Coerce Family Members to Consent to Searches and Share Information.

49.     Just as the ILP Program utilizes 'Prolific Offender Checks' to conduct warrantless searches, and ultimately uses those searches as a means of intimidation, harassment and coercion, the ILP Program also utilizes arbitrary code enforcement as a pretext to accomplish the same illegitimate goals and also to punish non-compliance by family members.

50.     Per ILP Program guidelines, PCSO deputies are to utilize the warrantless searches conducted as part of 'Prolific Offender Checks' to determine a basis for selective code enforcement against targets and their associates.

51.     Conversely, completing the vicious cycle of pretextual law enforcement, code enforcement visits are often just a pretext for interrogations of family members regarding ILP Program targets, further warrantless searches of property, and an opportunity to coerce consent to searches of the family residence.

52.     Consistent with the ILP Program directives, PCSO deputies began utilizing county ordinance violations selectively and pretextually against Ms. Kates to justify continuous encroachment and searches of her property, to punish her and her family for a lack of cooperation and to coerce her to begin to cooperate with deputies in their efforts to monitor and pursue her son.

53.     PCSO deputies openly admitted the pretextual nature of the ordinance enforcement, the fact that their actions would not stop, and that the intent was to gain consent to search the home and general cooperation with deputies in their efforts to target Ryan.

54.     PCSO's practice is to leverage threats of code enforcement and costly violations to coerce family members to cooperate. If the threats of code enforcement alone do not successfully provoke the desired compliance, the PCSO turns to active enforcement of code violations as a pretext to continue their warrantless searches

and investigations, to punish prior non-compliance and leverage compliance moving forward.

55.    PCSO deputies explicitly demand cooperation from family members against ILP Program targets in exchange for relief from arbitrary code enforcement.

56.    During their first few visits, PCSO deputies openly discussed what citations they could levy against Ms. Kates after she refused to let them search her home and asked deputies to leave her property.

57.    On May 4, 2021, after several warrantless searches of Ms. Kates's property and failed attempts to gain cooperation from Ms. Kates against her son, PCSO deputies cited her residence for lack of proper numbering, a commonly utilized pretextual county ordinance violation under the ILP Program.

58.    On this specific occasion, when deputies were asked to leave and told that they didn't have the right to be on the property, the deputies repeatedly confirmed the pretextual nature of the code enforcement.

59.    One Deputy stated, "we do because of the county ordinance violation occurring" and another quickly added "that, and we're looking for a violent felon." When they were asked whether any surrounding homes were being cited for the same violation, PCSO deputies bluntly answered "nope, but they're also not hiding someone who is committing a felony." When Mr. DeSimone remarked that the selective code enforcement amounted to harassment, deputies responded, "it's not,

we're here because we're looking for someone who is a felon" and later added "this is the thing, if it wasn't such an important case, then I wouldn't even be here in the first place."

60.     PCSO deputies did not attempt to hide the true purpose of the visit, acknowledging at the very beginning of the interaction that most of the deputies present were not on site for code enforcement purposes at all, and that even the deputies that supposedly were, wanted to talk to Ryan. (Upon arriving and being asked "how can we help you?" a PCSO deputy responded "well they (the other PCSO deputies present) came out here for another reason, we're giving you this citation for county ordinance violation, obviously we want to talk to Ryan.").

61.     During the same code enforcement visit, after Ms. Kates and Mr. DeSimone acknowledged that the deputies could hand them a citation, the deputies were asked to leave the private property.

62.     The deputies refused to leave and insisted that they could legally stay "because of the county ordinance violation occurring," intimating that so long as the violation was not instantly cured the PCSO had a free pass to remain on the property. Despite having identified and communicated the nature of the basic violation, deputies insisted that they were conducting "an active investigation into a city ordinance," which allowed them to stay on the property and continue their interrogation regarding Ms. Kates's son.

63.     Deputies issuing the citation spent the entirety of their time on property attempting to gather information regarding Ryan and to coerce consent for a search of the home.

64.     PCSO deputies explicitly attempted to leverage cooperation in exchange for relief from code enforcement, saying "Let us take a look inside. We'll know he's not here. It'll be super easy then we can leave. Alright? That's all we need."

65.     When Ms. Kates refused to cooperate, PCSO Deputies issued a citation, which they delivered while openly taunting Ms. Kates and her family by sarcastically asking each other whether they had $500, the citation amount, to throw away.

66.     Deputies were also eager to point out that the citations would be re-issued every couple of days if not cured immediately.

67.     Visibly frustrated with the lack of cooperation in their investigation, PCSO deputies "guaranteed" that they would be back, then proceeded to walk across the property shouting for Ryan to "come out," "quit hiding," and face them "like a man."

68.     The visit lasted long past any reasonable amount of time needed to provide a citation. While two deputies questioned Mr. DeSimone at the front of the

home regarding Ryan, at least five other officers either walked around the property or stood facing the property in a show of force.

69.    As is common with all tactics under the ILP Program, PCSO utilizes arbitrary and pretextual code enforcement continuously and systematically. Ms. Kates received a citation for her shed, despite providing proof of the necessary permits, not long after the initial citation for numbering on her home was issued. After Ms. Kates successfully contested the improper citation for her shed, PCSO deputies issued yet another identical citation for the same shed.

**70.**    During a later visit to Ms. Kates's home, a PCSO deputy who had just failed in his attempt to coerce a search of her residence, taunted Ms. Kates stating: "have fun with the county ordinance citations, make sure to get those paid or else there's going to be a warrant for you too."

## INJURY TO PLAINTIFF

71.    Ms. Kates has been directly harmed by the PCSO through their implementation of the ILP Program.

72.    Ms. Kates's son Ryan became an official target of the PCSO based, in part, on his criminal record.

73.    Based on ILP Program protocol, PCSO turned their attention to Ms. Kates and her family as well as her residence to locate and gather information regarding her son Ryan.

74.   PCSO deputies routinely enter onto Ms. Kates's property without permission or announcement.

75.   PCSO deputies come at all hours of the night and early morning, banging on doors and windows, terrifying Ms. Kates and her family.

76.   PCSO deputies refuse to cease interactions when they are asked to. PCSO deputies repeatedly demand to search Ms. Kates's home and to gather information on, and cooperation against, her son.

77.   In between visits, PCSO deputies consistently intimidate Ms. Kates and her family by stationing a PCSO vehicle and deputies in front of her home.

78.   PCSO deputies have issued multiple citations for county ordinance violations, including a $500 violation for lettering on the home and $500 violation for her shed.

79.   PCSO deputies made it clear that the violations issued served as a punishment for "affiliation" with, and a lack of cooperation against, Ryan.

80.   PCSO deputies threatened Ms. Kates with arrest if she reported their harassment, and on one occasion even mentioned that such an effort to exercise her rights would "get her dead and arrested."

81.   PCSO deputies threatened Ms. Kates with further harassment and punishment should she not begin to cooperate.

82.    For months, Ms. Kates was terrified to invite her own son back to her home because of the behavior of PCSO.

83.    Ms. Kates suffers extreme anxiety because of the PCSO and ILP Program. PCSO actions under the ILP Program have affected her sleep and appetite. She has lost considerable weight since becoming a focal point of the PCSO's ILP Program tactics and has manifested various physical and psychological symptoms of illness and trauma.

84.    Ms. Kates has sought treatment from a psychologist and has visited her cardiologist many times since the harassment began. Her doctors have documented her significant symptoms and serious medical complications stemming from her interactions with the PCSO.

85.    Ms. Kates has become crippled with fear and is often unable to leave her home for even basic needs as she is afraid of police retaliation. This is especially true when PCSO deputies are constantly stationed outside her home.

86.    Ms. Kates's emotional distress is exacerbated by the fact that she is unable to provide a basic level of safety and reassurance to her two grandchildren who reside with her, both of whom have communicated their fear of the PCSO and what they may do.

87.    Ms. Kates has been deprived of the most basic level of physical and emotional security and well-being and was forced to be distant from her son for

17

months as a direct result of PCSO's unrelenting harassment and abuse and intentional and flagrant violation of her constitutional rights.

**88.** The PSCO continues to harass Ms. Kates.

## COUNT I - 4th Amendment Unreasonable Search and Seizure 42 U.S.C. § 1983

89.     Paragraphs 1-88 of this Complaint are incorporated as if restated fully herein.

90.     As a result of the PCSO ILP Program's official policy mandating "Prolific Offender Checks," Ms. Kates has been the victim of repeated warrantless searches on and of her property at all hours of the day and night.

91.     PSCO deputies repeatedly intruded on the curtilage of Ms. Kates's home without a warrant, without consent and absent exigent circumstances, for the purpose of gathering information in their investigations.

92.     PCSO deputies' physical intrusion and searches of Ms. Kates's property aimed to gather information through direct observation as well as through intimidation, harassment and ultimately coercion of Ms. Kates to provide information to officers.

93.     To that end, intrusions, searches to identify ordinance violations, and later to serve them, were a pretext to search Ms. Kates's property without a warrant and to physically intrude on her curtilage for the purposes of criminal investigation.

94.     PCSO searches were objectively unreasonable and were intentionally undertaken as part of the ILP Program protocols with willful indifference to Ms. Kates's constitutional rights.

95.      The misconduct described in this Count was undertaken pursuant to the policy and practice of the Pasco County Sheriff's Office Intelligence-Led Policing Program in the manner described more fully above.

96.     PCSO deputies will continue to violate Ms. Kates's Fourth Amendment rights, and have in fact promised to do so, absent injunctive relief by the Court.

## COUNT II - 1st Amendment Freedom of Association 42 U.S.C. § 1983

97.     Paragraphs 1-88 of this Complaint are incorporated as if restated fully herein.

98.     Under the ILP Program, PCSO deputies are instructed to gather information on and continuously and systematically target associates, including family members, of individuals deemed likely future offenders.

99.     PCSO deputies conduct unwanted and warrantless searches of Ms. Kates's property, including the curtilage of her home, often at unreasonable hours, in an attempt to harass and intimidate Ms. Kates and her family, to collect information and to coerce compliance.

100.    This behavior is entirely based on Ms. Kates's relationship to her own son. Ms. Kates, like many similarly situated family members targeted by the ILP

Program, is not suspected of associating with any criminal activity, but rather targeted and punished for her personal association with her own son.

101.   Per ILP Program directives, PCSO deputies utilize code violations as a pretext to search Ms. Kates's property, to punish her for failing to cooperate against her son, and to coerce her to allow deputies to search her home and to share information about her son.

102.   Ms. Kates is targeted with these pretextual violations merely and solely on the basis of her familial association with her own son.

103.   PCSO's actions have severely and unreasonably infringed upon Ms. Kates's Constitutional Right to free association with her son.

104.   Ms. Kates has suffered immediate and direct injury as a result of PCSO's violation of her First Amendment rights and is entitled to compensation accordingly.

105.   PCSO deputies will continue to violate Ms. Kates's First Amendment rights, and have in fact promised to do so, absent injunctive relief by the Court.

### COUNT III - 14th Amendment Due Process 42 U.S.C. § 1983

106.   Paragraphs 1-88 of this Complaint are incorporated as if restated fully herein.

107.   The Due Process Clause of the Fourteenth Amendment protects the right to be free from punishment for the crimes or wrongdoings of another.

108.   The Due Process Clause of the Fourteenth Amendment protects the right to be free from arbitrary, irrational, and pretextual enforcement of the law.

109.   The actions of PCSO deputies under the ILP Program, as described more fully in the preceding paragraphs, including but not limited to constant warrantless searches of Ms. Kates's property, late night and early morning intrusions, threats of arrest, unrelenting harassment and intimidation, and selective pretextual code enforcement and fine assessments, amount to punishment for the alleged crimes, or criminal profile, of her son.

110.   The ILP Program prescribed practice of intentionally aiming code enforcement at, and utilizing code enforcement against, family members of desired targets, including Ms. Kates, is objectively arbitrary, irrational and pretextual.

111.   Ms. Kates and her family have been targeted by this behavior since about March 13, 2021.

112.   The PCSO deputies carrying out this ILP Program directive have confirmed their intentions are indeed entirely pretextual.

113.   PCSO's explicit policy of enforcing the law in such an arbitrary, irrational and pretextual manner, and utilizing such selective enforcement as a means of punishing and coercing individuals, violates the fundamental Due Process Rights of all those targeted, including Ms. Kates.

114.   Ms. Kates has suffered immediate and direct injury as a result of PCSO's violation of her Fourteenth Amendment Due Process right to be free from punishment for the crimes of another and is entitled to compensation accordingly.

115.   Ms. Kates has suffered immediate and direct injury as a result of PCSO's violation of her Fourteenth Amendment Due Process right not to be subject to arbitrary, irrational and pretextual law enforcement, and is entitled to compensation accordingly.

116.   PCSO deputies will continue to violate Ms. Kates's Fourteenth Amendment rights, and have in fact promised to do so, absent injunctive relief by the Court.

## COUNT IV - 14th Amendment Equal Protection 42 U.S.C. § 1983

117.   Paragraphs 1-88 of this Complaint are incorporated as if restated fully herein.

118.   The Equal Protection Clause of the Fourteenth Amendment protects the right to be free from arbitrary, irrational, and pretextual enforcement of the law.

119.   The ILP Program intentionally aiming code enforcement at against family members of desired targets, including Ms. Kates, is objectively arbitrary, irrational and pretextual on its face.

120.   The PCSO deputies carrying out this ILP directive have confirmed their subjective intentions are indeed entirely pretextual.

22

121.   PCSO's explicit policy of enforcing the law in such an arbitrary, irrational and pretextual manner, and utilizing such selective enforcement as a means of punishing and coercing individuals, violates the fundamental Equal Protection Rights of all those targeted, including Ms. Kates.

122.   Ms. Kates has been discriminated against and treated differently by the PCSO because her son, Ryan, is a target of the PCSO based on the ILP Program's crude algorithm's determination that Ryan is a "prolific offender."

123.   Ms. Kates was not officially notified that she would be a target of this behavior endorsed by the ILP Program.

124.   Ms. Kates has suffered immediate and direct injury as a result of PCSO's violation of her Fourteenth Amendment Equal Protection Right not to be subject to arbitrary, irrational and pretextual law enforcement, and is entitled to compensation accordingly.

125.   PCSO deputies will continue to violate Ms. Kates's Fourteenth Amendment rights, and have in fact promised to do so, absent injunctive relief by the Court.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiff, Eileen Kates, respectfully requests that this Court provide the following relief:

A.    A declaratory judgment against Defendant providing the ILP Program is unconstitutional because it allows for and encourages warrantless and suspicion less searches and seizures in violation of the Fourth Amendment.

B.    A declaratory judgment against Defendant providing the ILP Program is unconstitutional because it unjustly punishes friends and family members of "prolific offenders," in violation of the Freedom of Association Clause of the First Amendment.

C.    A declaratory judgment against Defendant providing the ILP Program is unconstitutional because it uses a crude algorithm to develop a list of "prolific offenders" without notice to the purported "prolific offender" in violation of the Due Process Clause of the Fourteenth Amendment.

D.    A declaratory judgment against Defendant providing the ILP Program is unconstitutional because it sanctions pretextual use of code enforcement violations in violation of the right to Equal Protection guaranteed under the Fourteenth Amendment.

E.    A permanent injunction prohibiting Defendant from enforcing the ILP Program in a manner that allows the PSCO to violate its citizens constitutional rights as stated in paragraphs A-D, above.

F.    An award of compensatory damages for each of the claims in an amount to be proven at trial.

G.      An award of one dollar in nominal damages.

H.      An award of Plaintiffs' costs, expert fees, and expenses, including reasonable

attorneys' fees, pursuant to 42 U.S.C. § 1988; and

I.      Further legal or equitable relief as this Court may deem just and proper.

Dated: February 9, 2022

Respectfully Submitted,

*/s/ Paul Thanasides*
Paul Thanasides
Florida Bar No.: 103039
paul@mcintyrefirm.com
clservice@mcintyrefirm.com
Joshua Smith
Florida Bar No.: 108915
joshua@mcintyrefirm.com
Mouhannad Atfeh
Florida Bar No.: 1019331
matfeh@mcintyrefirm.com
complexlit@mcintyrefirm.com
McIntyre Thanasides Bringgold Elliott
   Grimaldi Guito & Matthews, P.A.
500 E. Kennedy Blvd., Suite 200
Tampa, FL 33602
Telephone: 813.223.0000
Facsimile: 813.225.1221
***Attorneys for Plaintiff***