```
                  UNITED STATES DISTRICT COURT
                   MIDDLE DISTRICT OF FLORIDA
                          TAMPA DIVISION
```

EILEEN KATES,

    Plaintiff,
v.                              Case No. 8:22-cv-342-VMC-TGW

CHRIS NOCCO,
in his official capacity as
Sheriff of Pasco County,

    Defendant.
_____/

## ORDER

This matter is before the Court on consideration of Plaintiff Eileen Kates' Motion to Exclude the Report and Testimony of Dr. Richard Hough (Doc. # 62), filed on April 14, 2023. Defendant Sheriff Chris Nocco responded on April 27, 2023. (Doc. # 78). For the reasons that follow, the Motion is granted in part and denied in part.

**I.**   **Background**

Ms. Kates initiated this action against Nocco, in his official capacity as Sheriff of Pasco County, on February 9, 2022, regarding Nocco's Intelligence Led Policing Program ("ILP Program"). (Doc. # 1). The complaint asserts Section 1983 claims based on alleged violations of the First, Fourth, and Fourteenth Amendments. (Id.). The essence of Ms. Kates' claims is that she "has been discriminated against and treated

1

differently by the PCSO because her son, Ryan, is a target of the PCSO based on the ILP Program's crude algorithm's determination that Ryan is a 'prolific offender.'" (Id. at 23). The parties then proceeded through discovery.

As part of his defense, Sheriff Nocco hired a police practices expert, Dr. Richard Hough. Dr. Hough became a law enforcement officer in 1979, and he has "continuously train[ed] law enforcement and corrections officers in various topics since 1980." (Doc. # 62-1 at 5). He has "taught law enforcement procedures and practices in the Florida Basic Recruit Training Programs (academy) for more than thirty-five years." (Id.). Dr. Hough has also "taught patrol and investigative practices for more than thirty-five years to law enforcement academy recruits, in-service law enforcement officers, and college students," as well as teaching police procedure courses at the college and university levels. (Id.). Dr. Hough has "published peer-reviewed journal articles on topics including policies addressing, and the dynamics of, criminal investigations." (Id.). He has previously "been retained as an expert in cases involving the training of law enforcement officers, and specifically in patrol practices and criminal investigations, and the agency policies and procedures addressing such matters." (Id. at 6).

2

In his report, Dr. Hough lists nineteen enumerated opinions and conclusions:

1. Pasco County, Florida, a community of more than a half million people, is part of the Tampa Bay Metropolitan Area. Population has increased significantly in the past decade. Pasco Sheriff's Office resources (staffing) have not kept pace.

2. The Intelligence-Led Policing (ILP) program of the Pasco Sheriff's Office is well-conceived, staffed, and operated pursuant to an agency-wide philosophy and manual.

3. The crime challenges communities, agencies, and officers face daily call for a variety of responses. Aligned with tactical and strategic concerns, the Pasco Sheriff's Office appropriately utilize traditional approaches and innovative methods to influence offenders, potential offenders, and criminogenic conditions that the agency can impact.

4. Agency members that are part of the Intelligence-Led Policing section work within defined organizational policies and procedures, receive training, supervision, and are responsive to an established chain of command.

5. The Strategic Targeted Area Response (STAR) Teams' and other patrol deputies' actions in this case were objectively reasonable and appropriate and in accordance with Constitutional guidance, state law, case law, PCSO policy, recruit academy training, and law enforcement practices.

6. Every jurisdiction has the authority to and must devise its own approach to how it will deal with the unique crime problems of its jurisdiction. PSO has made the judgment it is entitled to address the apprehension of wanted subjects through, among other methods, aspects of ILP. Neither the ILP manual nor written policies direct deputies on how to conduct wanted offender checks at known

locations. It is clear from the materials that the circumstances vary greatly depending on, among other things, varied deputies carrying out checks, cause for the visits, and level of cooperation of those with whom deputies interact.

7. Crime deterrence and prevention strategies are pursued by approximately 18,000 separate law enforcement agencies across the United States, and many more around the world.

8. The challenge of crime prevention does not alter the public expectation that their police officers work to accomplish what can be done in this, among many, objectives.

9. Communities, and by extension their elected and appointed public safety professionals, select public safety programs and strategies. Such decisions are value-weighted locally and bound by resource constraints. Such efforts may not violate law or constitutional dictates.

10. The documentation I have reviewed in this matter does not reveal a pattern of objectionable policies or behaviors that breach constitutional criteria routinely considered in local-level public safety policymaking.

11. The initial design of the Intelligence-Led Policing program was articulated to be open to the evolving state of intelligence and data usage and techniques. There have been multiple versions of the ILP manual.

12. The normal and routine practice of visiting places where a wanted felon may be located is not unique to ILP. I reviewed no information in the record that indicated this normal search for a wanted felon was actually connected to the ILP.

13. Based on preparations, policies, training, and proper supervisory action, the Pasco County Sheriff's Office responds to crime prevention, investigation, and offender apprehension in a

manner consistent with contemporary law enforcement training and practices.

14. The implementation of innovative crime prevention approaches in this case was reasonable and follows standard practice in ongoing public sector efforts to work within legislatively apportioned budgets. The use of various sources of data and information were conducted within law, Pasco County Sheriff's Office policy and contemporary law enforcement practices and training at the time of the complaint. In this matter, there was no indication that investigative methods were used inappropriately, improperly, unnecessarily, or in any way other than as authorized.

15. The Pasco County Sheriff's Office uses acceptable management methods. Law enforcement bureaucracy is constrained by statute, case law, policy, training, supervision by higher authority, report review, and the proper conduct of the officers who wield the authority to enforce laws. PSO deputies assigned to law enforcement duties have received training in appropriate practices.

16. Based on preparations, policies, training, and proper supervisory action, the PSO responds to reported crime incidents in a manner consistent with contemporary law enforcement practices.

17. The Pasco County Sheriff's Office provides in-service training regarding law enforcement functions to supplement and extend beyond that which Florida certified law enforcement officers already receive during their Academy training.

18. I viewed BWV of deputies interacting with Eileen Kates and found them to be generally cordial, pleasant, cooperative. Some others may have a difference of opinion.

19. The official reports of PSO deputies in this matter are consistent and agree on the facts and do not contradict body-worn video in the case.

(Id. at 26-29).

Now, Ms. Kates moves to exclude Dr. Hough's report and testimony. She argues that his methodology is unreliable and will not assist the trier of fact. (Doc. # 62). Sheriff Nocco has responded (Doc. # 78), and the Motion is ripe for review.

**II. Discussion**

Federal Rule of Evidence 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Implementing Rule 702, Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993), requires district courts to ensure that any scientific testimony or evidence admitted is both relevant and reliable. See Id. at 589-90. The Daubert analysis also applies to non-scientific expert testimony. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147 (1999). District courts must conduct this gatekeeping function "to ensure that speculative, unreliable expert testimony does not reach the jury under the mantle of reliability that accompanies the

6

appellation 'expert testimony.'" Rink v. Cheminova, Inc., 400 F.3d 1286, 1291 (11th Cir. 2005).

The Eleventh Circuit "requires trial courts acting as gatekeepers to engage in a 'rigorous three-part inquiry.'" Hendrix v. Evenflo Co., 609 F.3d 1183, 1194 (11th Cir. 2010). The district court must assess whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

Id. The proponent of the expert testimony must show, by a preponderance of the evidence, that the testimony satisfies each requirement. Id.

Ms. Kates does not challenge Dr. Hough's qualifications. And, indeed, Dr. Hough is qualified to provide his opinions. However, Ms. Kates does challenge Dr. Hough's methodology and the helpfulness of his report and testimony to the trier of fact.

   1.  **Reliability**

The first question is whether Dr. Hough's methodology is reliable. "Exactly *how* reliability is evaluated may vary from case to case, but what remains constant is the requirement

7

that the trial judge evaluate the reliability of the testimony before allowing its admission at trial." <u>United States v. Frazier</u>, 387 F.3d 1244, 1262 (11th Cir. 2004) (citing Fed. R. Evid. 702, Advisory Committee Notes (2000)). There are four recognized, yet non-exhaustive, factors a district court may consider in evaluating reliability:

> (1) whether the expert's methodology has been tested or is capable of being tested; (2) whether the technique has been subjected to peer review and publication; (3) the known and potential error rate of the methodology; and (4) whether the technique has been generally accepted in the proper scientific community.

<u>Seamon v. Remington Arms Co.</u>, 813 F.3d 983, 988 (11th Cir. 2016) (citations omitted). A district court can take other relevant factors into account as well. <u>Id.</u> (citations omitted).

"If the [expert] witness is relying solely or primarily on experience, then," in establishing reliability, "the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." <u>Frazier</u>, 387 F.3d at 1261 (citation and internal quotation marks omitted). The Court's analysis as to reliability "focus[es] 'solely on principles and methodology,

8

not on the conclusions that they generate.'" Seamon, 813 F.3d at 988 (citation omitted).

Ms. Kates argues that "Dr. Hough does not rely on any methodology or analytical process to reach his" conclusions, instead relying "exclusively on his professional and personal 'experience.'" (Doc. # 62 at 5). According to Ms. Kates, "Dr. Hough's conclusions do not rest on a reliable factual foundation because, in stating his conclusions, he does not rely on any actual facts." (Id. at 6). The Court disagrees.

Dr. Hough persuasively outlines his methodology in a separate section of his report. (Id. at 7-9). He reached his conclusions by (1) relying on his experience as a law enforcement officer and academic studying police procedures, (2) "utiliz[ing] recommended national standards, model policies, handbooks, and guides put forth by various professional organizations such as the International Association of Chiefs of Police (IACP), the Police Executive Research Forum (PERF), the National Sheriffs Association (NSA), National Tactical Officers Association (NTOA), the Commission on the Accreditation of Law Enforcement Agencies (CALEA), [and] American Jail Association (AJA)," (3) reviewing "national and international bodies of literature from peer-reviewed academic journals, as well as government

9

sources" about police policies and practices, and (4) reviewing all case materials. (Id. at 7-9).

In short, Dr. Hough's methodology involves the review of relevant factual material in this case, consideration of outside materials including model policies, national standards, and peer-reviewed literature about police practices and procedures, as well as his lengthy experience as a law enforcement officer and teacher of police and investigative practices. Dr. Hough analyzed the facts of this case with reference to all those materials and relying on his experience. This methodology is sufficiently reliable. See Washington v. City of Waldo, Fla., No. 1:15CV73-MW/GRJ, 2016 WL 3545909, at *3 (N.D. Fla. Mar. 1, 2016)(finding police practices expert's methodology reliable where the expert "used his law enforcement experience, knowledge, and training in police practices, including his review of court cases, and evaluated the facts of the instant case to form his opinions"); Bussey-Morice v. Kennedy, No. 6:11-cv-970-CEH-GJ, 2012 WL 7992419, at *3 (M.D. Fla. Dec. 28, 2012) ("As demonstrated in Lynch's affidavit, he uses his experience in police practices and procedure, including select court cases, and evaluates the facts in this case to form his opinions. There is nothing inherently unreliable about this

10

methodology." (citation omitted)); see also Dudash v. S.-Owners Ins. Co., No. 8:16-cv-290-JDM-AEP, 2017 WL 1969671, at *3 (M.D. Fla. May 12, 2017) (denying a Daubert motion to exclude an insurance expert and stating that, as "[h]er opinions were formulated based on her review of the record," the "argument that her review is unreliable is unpersuasive").

Any alleged flaws in Dr. Hough's methodology should be addressed during cross-examination. See Maiz v. Virani, 253 F.3d 641, 666 (11th Cir. 2001) ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking [debatable] but admissible evidence." (citations and internal quotation marks omitted)). Thus, the Motion is denied as to reliability.

2. **Assistance to Trier of Fact**

Expert testimony must also assist the trier of fact. Fed. R. Evid. 702. "By this requirement, expert testimony is admissible if it concerns matters that are beyond the understanding of the average lay person." Frazier, 387 F.3d at 1262 (citation omitted). "[T]he court must 'ensure that the proposed expert testimony is "relevant to the task at hand," . . . i.e., that it logically advances a material

11

aspect of the proposing party's case.'" Allison v. McGhan, 184 F.3d 1300, 1312 (11th Cir. 1999) (citation omitted).

So, while "[t]he 'basic standard of relevance . . . is a liberal one,' Daubert, 509 U.S. at 587, . . .[,] if an expert opinion does not have a 'valid scientific connection to the pertinent inquiry[,]' it should be excluded because there is no 'fit.'" Boca Raton Cmty. Hosp., Inc. v. Tenet Health Care Corp., 582 F.3d 1227, 1232 (11th Cir. 2009)(citations omitted). "Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." Frazier, 387 F.3d at 1262-63 (citation omitted).

Ms. Kates argues that three of Dr. Hough's opinions are impermissible legal conclusions. (Doc. # 62 at 8-9). She also argues that several of Dr. Hough's conclusions are inadmissible because they do not require an expert to be understood. (Id. at 9). Ms. Kates finally argues that all of Dr. Hough's opinions lack specificity such that they would be unhelpful to the jury. (Id.).

The Court disagrees with Ms. Kates as to the specificity of Dr. Hough's opinions. Dr. Hough has provided a list of the materials he reviewed in reaching his conclusions, and a lack

12

of internal citations to those materials in his listed conclusions does not render them unhelpful. Indeed, Ms. Kates cites no case in support of her specificity argument. (Doc. # 62 at 9); see also Herbert v. Architect of Capitol, 839 F. Supp. 2d 284, 298 (D.D.C. 2012) ("[T]he [defendant] has simply failed to support its argument with any meaningful measure of factual or legal argument. Courts need not consider cursory arguments of this kind, and the Court declines to do so here.").

Furthermore, Dr. Hough's opinions are not so basic that they do not concern matters beyond the average lay person. True, some of his conclusions address matters that a juror could reach his own conclusions about, such as the consistency of the incident footage and police reports about the incident or police officers' demeanor. Nevertheless, Dr. Hough's conclusions are drawn from years of experience training police officers on proper procedures and tactics — an area with which most laymen are unfamiliar. Thus, his opinions, which touch on whether the officers here behaved in accordance with proper police procedures, are still helpful to the trier of fact.

Finally, Ms. Kates's argument concerning legal conclusions has greater merit. "No witness may offer legal

conclusions or testify to the legal implications of conduct." Dudash, 2017 WL 1969671, at *2; see also Washington v. City of Waldo, Fla., No. 1:15CV73-MW/GRJ, 2016 WL 3545909, at *3 (N.D. Fla. Mar. 1, 2016) ("[A] witness typically may not 'give purely legal conclusions,' such as that an officer lacked probable cause to arrest, or that a search conducted without a warrant violated the Fourth Amendment, as such conclusory testimony would 'tell the jury what result to reach' on ultimate issues only the jury should resolve." (citations omitted)). But, the Eleventh Circuit has acknowledged that "the distinction between whether challenged testimony is either an admissible factual opinion or an inadmissible legal conclusion is not always easy to perceive." Hanson v. Waller, 888 F.2d 806, 811 (11th Cir. 1989). Additionally, "the mere reference to a term with legal significance in an expert opinion does not necessarily transform the opinion into an inadmissible legal conclusion." Feldman v. Target Corp., No. 3:19-cv-419-MMH-PDB, 2021 WL 1172794, at *3 (M.D. Fla. Mar. 29, 2021).

Here, certain of Dr. Hough's opinions are legal conclusions — specifically, Conclusion 10 and portions of Conclusions 5 and 14. In Conclusion 5, Dr. Hough opines in part that the police officers' actions in this case were "in

accordance with Constitutional guidance, state law, [and] case law." (Doc. # 62-1 at 27). In Conclusion 10, he opines that the policies and behavior by the Sheriff's Office did not "breach constitutional criteria," meaning that the policies and behavior at issue were not unconstitutional. (Id. at 28). Finally, in Conclusion 14, Dr. Hough opines in part that the "use of various sources of data and information were conducted within law." (Id.).[1] In these portions of his report, Dr. Hough is impermissibly propounding legal conclusions about the legality of Sheriff Nocco's conduct.

For this reason, only to the extent Dr. Hough opined that certain conduct was constitutional or otherwise lawful, his conclusions are excluded from trial.

---

[1] Also in Conclusion 14, Dr. Hough opines that the "implementation of innovative crime prevention approaches in this case was reasonable." (Id. at 28). Because the word "reasonable" has both a common and legal definition, the Court is unsure whether Dr. Hough is attempting to propound a legal conclusion in this portion of his opinion. Thus, at this time, the Court will not preclude Dr. Hough from offering this opinion. However, the Court warns Sheriff Nocco that it will be impermissible for Dr. Hough to opine upon the reasonableness of Sheriff Nocco's conduct in the legal sense at trial. See Feldman, 2021 WL 1172794, at *2 (explaining in a negligence case that "courts have excluded expert testimony amounting to conclusions whether conduct was reasonable . . . when such testimony embraces the legal definition of the terms").

15

Accordingly, it is hereby

**ORDERED, ADJUDGED,** and **DECREED:**

Plaintiff Eileen Kates' Motion to Exclude the Report and Testimony of Dr. Richard Hough (Doc. # 62) is **GRANTED in part** and **DENIED in part**. Dr. Hough may not proffer legal conclusions at trial, including the legal conclusions contained in Conclusions 5, 10, and 14 from his report. The Motion is denied in all other respects.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this 15th day of May, 2023.

_____
VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE