UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

EILEEN KATES,

    Plaintiff,

v.                          Case No. 8:22-cv-342-VMC-TGW

CHRIS NOCCO,
in his official capacity as
Sheriff of Pasco County,

    Defendant.
_____/

## ORDER

This matter is before the Court on consideration of Defendant Sheriff Chris Nocco's Motion for Final Summary Judgment (Doc. # 63), filed on April 14, 2023. Plaintiff Eileen Kates responded on May 8, 2023. (Doc. # 87). Sheriff Nocco replied on May 22, 2023. (Doc. # 92). For the reasons that follow, the Motion is granted.

## I.  Background

On February 9, 2022, Ms. Kates initiated this action against Sheriff Nocco in his official capacity as Sheriff of Pasco County. (Doc. #1). The complaint asserts violations of the First, Fourth, and Fourteenth Amendments arising out of Sheriff Nocco's Intelligence-Led Policing Program ("ILP

1

Program"). (Id.). The essence of Ms. Kates' claims is that she "has been discriminated against and treated differently by the [Pasco County Sheriff's Office ("PSO")] because her son, Ryan, is a target of the [PSO] based on the ILP Program's crude algorithm's determination that Ryan is a 'prolific offender.'" (Id. at 23). The parties proceeded through discovery, which revealed the following.

### A.   Ms. Kates

The claims in this action rest entirely on interactions between PSO employees and Ms. Kates between March 20, 2021, and July 24, 2021 ("PSO Contacts"). (Eileen Kates Depo. at 114:8-16). The PSO Contacts took place on nine days: March 20, 21, 23, April 4, 8, 11, and July 12, 15, and 24 of 2021. (Id. at 140:17-141:4).

Ms. Kates has used numerous last names, including Kates, Duncan, DeSimone, and Sota. (Id. at 7:11-17). She has two living children, Ryan and Lauren Kates. (Id. at 13:18-23; 15:4-6; 52:18-20).

Ms. Kates lived in a house in Holiday, Florida ("the Kates Home") during the PSO Contacts and still does today. (Id. at 12:16-13:3). Ms. Kates testified that, between

2

January and October 2021, Ryan Kates resided off and on at the Kates Home as a "couch surfer." (Id. 17:7-17). Although Ryan Kates testified that he "didn't live there" for the "whole time [he] was on probation," he also testified that he "stayed in a couple different rooms" of the home, including the garage. (Ryan Kates Depo. at 21:7-22:20). He also testified that "when [he] moved back from Arizona [in June 2021], [he] stayed there for . . . two or three weeks" until he got into an argument with Ms. Kates. (Id. at 25:15-17).

Additionally, Ryan Kates used the Kates Home as his address on his driver's license during the PSO Contacts. (Id. at 52:3-12). He owned a Hyundai Elantra which was parked at the Kates Home for a few months in 2021 after he had left Florida for Arizona in February or March 2021. (Id. at 14:8-15:13; Eileen Kates Depo. at 120:11-122:7). The vehicle had been removed by July 2021 because Ryan Kates had it "voluntar[ily] repossess[ed]." (Ryan Kates Depo. at 14:8-15:13; Pl. Ex. 13, July 12 BWC, at 01:37-01:52).

After the PSO Contacts ended, Ms. Kates believed that, because of what she read "on social media" and her son's criminal history as a "repeat offender," Ryan Kates was

3

possibly on "a list" as a prolific offender. (Eileen Kates Depo. at 23:10-24:23).

Ryan Kates has never been a prolific offender nor was Ms. Kates ever told by a member of PSO that her son was a prolific offender. (Id. at 24:24-25:13; Beaman Affidavit at ¶ 5).

**B.   ILP Program**

PSO Deputy Nicholas Hammelman described Intelligence-Led Policing as "how [PSO officers] collect, analyze and share information in a way to better combat crime within Pasco County." (Hammelman Depo. at 107:6-11). The ILP Program was governed by the "Intelligence-Led Policing Manual." As relevant here, one manual ("the 2018 ILP Manual") was in effect from January 2018 through July 1, 2021. (Doc. # 64-2). Beginning on July 1, 2021, the 2021 ILP Manual went into effect. (Doc. # 64-3).

As outlined in the 2018 ILP Manual, the ILP Program focuses on policing offenders who were thought to be committing the majority of the crimes in Pasco County. The 2018 ILP Manual discusses "problem people" and "Priority Offenders," and the various subsets of such groups:

4

> Intelligence-led Policing calls for a strategic focus on **problem people** by targeting the criminal elite, those offenders who if incarcerated will net the largest benefit of crime reduction. The Pasco Sheriff's Office brings a strategic focus to the criminal elite by identifying **Prolific Offenders**, Top 5 Offenders, District Targets, Abusive Offenders, and Priority Warrants. In addition, Florida Statutes provide a focus on Sex Offenders, Career Offenders, and Prolific Juvenile Offenders. **Collectively, we refer to these categories of offenders as Priority Offenders.**

(Doc. # 64-2 at 17) (emphasis added).

Thus, the 2018 ILP Manual was not applicable only to "prolific offenders." It applied to the broader category of "problem people" or "Priority Offenders," like "priority warrants" or those who fit within different categories. (Id.). The sub-group of "district targets" "is identified through the collaboration of the district analysts, district commander, and district-based investigative unit supervisors." (Id. at 21). "In order to be selected [as a district target], the offender must have an active warrant or local probable cause pick-up order. In addition, this offender should satisfy the question: 'if this person is apprehended, will it result in a significant impact on crime in the area?'" (Id.).

In contrast, the 2021 ILP Manual, which took effect on July 1, 2021, makes no mention of "problem people." (Doc. # 64-3). Rather, it mentions only "prolific offenders" — and does so twice. See (Id. at 8) ("Our criminal justice system could have a more significant impact on crime if the criminal justice system focused on the most serious and prolific offenders who have the largest impact on our crime picture by virtue of the numerous crimes they continue to commit."); (Id. at 14) ("Understanding that in many cases there is a correlation between prolific offenders and behavioral health/substance abuse issues, members of [the Behavioral Health Intervention Team] will perform outreach to these individuals. The goal is to have specially trained deputies to positively interact with these individuals who can provide them resources. The goal is to end the cycle of recidivism, reduce victimization and enhance community safety.").

C. **Ryan Kates's History**

Ryan Kates was arrested on a warrant for aggravated assault from Scranton, Pennsylvania on June 25, 2014. This arrest occurred at the Kates Home. (Ryan Kates Depo. at Ex. 1).

On January 23, 2019, Ryan Kates was arrested and then charged with aggravated stalking of his ex-girlfriend, Elizabeth Keune, and criminal mischief in case 2019-CF-461 in Pasco County, Florida. (Id. at Ex. 2). The state court issued Ryan Kates a no contact order with Ms. Keune on January 24, 2019. (Id. at Ex. 3).

On April 23, 2019, Ryan Kates was arrested for having contact with Ms. Keune between April 14 and 22, 2019. He was arrested on a new charge of aggravated stalking and on a violation of the no contact order that was entered as part of his pretrial release in case 2019-CF-461. (Id. at Ex. 5). On May 15, 2019, he was charged with aggravated stalking of Ms. Keune, a third-degree felony. (Id. at Ex. 7).

On June 21, 2019, Ryan Kates entered a plea of guilty in both cases 2019-CF-461 and 2019-CF-2575. He was adjudicated guilty of criminal mischief and aggravated stalking (both third-degree felonies) and the lesser included offense of stalking (a misdemeanor). He was sentenced to 36 months of probation concurrently. (Id. at Exs. 4 & 8).

On September 18, 2019, in case 2019-MM-4772 in Pasco County, Ryan Kates was charged with violating his pretrial

release by contacting Ms. Keune in April 2019. (Id. at Ex. 11). The next year, in January 2020, in case 2019-MM-2169, he pled guilty to violating a condition of his pre-trial release by contacting Ms. Keune in April 2019, and was sentenced to time served. (Id. at Ex. 10). On August 5, 2020, in case 2019-MM-4772, Ryan Kates pled no contest to violation of his pretrial release conditions. (Id. at Ex. 12). On February 24, 2021, he received early termination of his probation. (Id. at 39:1-23; Beaman Affidavit at Ex. A at 55).

Ryan Kates dated Ms. Keune off and on since 2016. During one of those breaks, Ms. Keune began dating Daniel Rau. (Ryan Kates Depo. at 33:24-35:6).

On March 23, 2021, Deputy Hammelman in case 2019-CF-1365 provided sworn testimony to a circuit court judge in applying for an arrest warrant for Ryan Kates. The basis for the warrant was that Ryan Kates left threatening voicemails for Mr. Rau, saying that he would "gut" the victim and kill the victim's family. The threats also included information about the victim's daily travel habits, which put the victim in a well-founded fear for his and his family's safety. Deputy Hammelman listened to these voicemails and confirmed that

these threats were made and that the phone number used was connected to Ryan Kates. (Id. at Ex. 13).

Ryan Kates had a warrant issued for his arrest on March 23, 2021, for aggravated stalking, in case 2019-CF-1365. (Id. at Ex. 14). On April 28, 2021, he was arrested in Mesa, Arizona on the arrest warrant. (Id. at Ex. 15). He did not fight extradition to Florida and agreed to return to the State to turn himself in on the warrant. (Id. at 69:15-70:21). He posted a $10,000 bond on April 30, 2021. (Id. at Ex. 15 at 12-14). On June 8, 2021, he turned himself into the Land O' Lakes Jail on the warrant for aggravated stalking where he was then released on bond. (Id. at Ex. 16).

Ryan Kates was also a suspect in the Pasco County Sheriff's Office case # 21-025091, in which the agency was investigating a battery that occurred on July 11, 2021, at a Speedway gas station. (Id. at Ex. 19). The offender, a white man, punched the victim in the face after a verbal dispute. (Id. at Ex. 19 at 7). When the offender got into his car to flee, the victim pulled off the paper tag from the back of the offender's car. (Id.). The PSO ran the tag and discovered that "it came back to" Ms. Kates. (Id. at 8). The police

9

report indicates that, over the phone, Ms. Kates "admitted the car belonged to her." (Id.).

In December 2022, Ryan Kates pled guilty in case 2021-CF-1365 to misdemeanor stalking, was adjudicated guilty, and received 12-months' supervised probation. (Id. at Exs. 17 and 18).

###### D.   **Contacts at the Kates Home**

On March 20, 2021, Deputy Hammelman began investigating case 21-010111, in which Ryan Kates was suspected of aggravated stalking. (Hammelman Depo. at Ex. A).

Deputy Hammelman went to the Kates Home because that was Ryan Kates's listed address and to "gather more information about him." (Id. at 80:9-13 & Ex. A at 153). Deputy Hammelman arrived at the Kates Home, where Ms. Kates's husband Robert DeSimone answered the door. Deputy Hammelman asked Mr. DeSimone a series of questions about Ryan Kates. (Id. at 23:21-23 & Ex. A at 153 & Ex. 1). Ms. Kates is visible on the body-worn camera footage, standing just inside the front door. (Id. at Ex. 1 at 01:40-2:18). The deputies did not immediately leave the Kates property after being told that

10

Ryan Kates was not there. (Pl. Ex. 4, Mar. 20 BWC B, at 02:40-03:05).

Also on March 20, 2021, a BOLO alert was issued for Ryan Kates. (Doc. # 87-3). The top of the BOLO page includes the title "Pasco Sheriff's Office/ Intelligence-Led Policing/ Chris Nocco, Sheriff." (Id.). The BOLO also states that "PC Exists" to arrest Ryan Kates for aggravated stalking. (Id.). In an internal email from March 22, a PSO Lieutenant forwarded the BOLO to other officers, writing in relevant part: "Please ensure there is a continuing effort to place Kates in custody. Please coordinate efforts between day/night shifts and STAR so that there is consistent pressure." (Doc. # 87-2 at 3).

A Strategic Targeted Area Response ("STAR") team is a specialized team within the PSO. According to the 2018 ILP Manual, STAR teams are "dedicated to reducing the crime in the district, with particular emphasis inside the STAR box and the immediate surrounding area." (Doc. # 64-2 at 66). A STAR box is a designated area "where crime is persistently dense over an extended period of time." (Id. at 22). "[T]here is an expectation that the STAR Team will spend the majority of their time working inside the STAR box or focused on

offenders who are impacting crime within the STAR box," with
a "particular emphasis on the Big 4 and violent crime." (Id.
at 66). The "Big 4" are crimes including firearm theft,
vehicle theft, and burglary of vehicles, residences, and
businesses. (Id. at 16). The STAR team "is expected to
actively work with other PSO members (particularly ILP and
detectives) and outside agencies to identify and target
prolific offenders." (Id. at 67). Also, the STAR team "will
regularly develop missions to target the priority offenders
who impact crime within the STAR boxes." (Id.).

On March 21, 2021, Deputy Hammelman returned to the Kates
Home to apprehend Ryan Kates "for aggravated stalking and
threatening to kill a person and their family members."
(Hammelman Depo. at 42:9-16). PSO deputies remained on Ms.
Kates's property after being told Ryan Kates was not there
and discussed using code citations as a reason to return.
(Id. at Ex. 3, Mar. 21 BWC, at 05:06-05:40).

On March 23, 2021, prior to knocking on the door of the
Kates Home, Ms. Kates came outside and asked deputies to
leave. (Eileen Kates Depo. at 156:11-19). When asked what
actions taken by the PSO on March 23, 2021, caused her mental

12

or emotional distress, Ms. Kates stated the issue was "[t]hat they were there again" "harassing [her] and wouldn't leave [her] alone," and that deputies "were constantly [t]here." (Id. at 155:9-156:2).

On April 4, 2021, PSO was called to the Kates Home by Ms. Kates's juvenile grandson to assist him in gathering his clothes from the home. (Brant Depo. at 111:12-16; Eileen Kates Depo. at 166:21-169:1). While there, the PSO deputies stated that they would also investigate County ordinance violations and look for Ryan Kates. (Pl. Ex. 9, Apr. 4 BWC F, at 00:30-00:40, 01:40-01:52, 03:37-03:42).

That day, PSO deputies, including Deputy Brant, went to the home, knocked and spoke to Mr. DeSimone who told deputies that Ms. Kates's grandson was not allowed inside the home. Ms. Kates was not present when PSO went to the Kates Home on April 4. (Eileen Kates Depo. at 165:12-17). However, she was on the phone with Mr. DeSimone while the PSO deputies were speaking with Mr. DeSimone so she could listen to the events. (Id. at 165:22-23).

Deputies did not force Mr. DeSimone to allow Ms. Kates's grandson to enter, nor did they enter themselves. (Brant Depo.

13

at 111:12-112:8 & Ex. 2 at 6:30-6:40). The PSO officers issued Mr. DeSimone a citation on April 4, 2021, for lack of posted address. Mr. DeSimone pled no contest and was ordered to pay a fine. (DeSimone Depo. at 24:21-27:6 & Exs. 1 & 6). Deputy Brant, who worked for the PSO both before and after the ILP Program, testified that the implementation of the ILP Program did not affect his actions at the Kates Home. (Brant Depo. at 112:12-23).

After the PSO deputies had initially spoken to Mr. DeSimone and issued the citation on April 4, two members of a STAR team, Corporal Heisen and Deputy Coco, arrived at the Kates Home. (Collins Depo. at Ex. 1, Apr. 4 BWC C, at 07:48-08:20; Doc. # 64-2 at 66-67). Corporal Heisen walked around the front curtilage of the Kates Home and spoke to Mr. DeSimone. (Pl. Ex. 8, Apr. 4 BWC E). During that conversation, Corporal Heisen asked about the location of Ryan Kates and warned that citations would continue to be issued if the problem — the lack of posted address — was not fixed. (Id.).

On April 8, 2021, deputies visited the Kates Home again. The deputies asked for Ryan Kates's location and Mr. DeSimone told them he was not there. (Pl. Ex. 10, Apr. 8 BWC B, at

14

02:07-02:16). Ms. Kates asked the deputies to leave the property and the deputies went back down to the street. (Id. at 02:22-02:56). But, soon after, deputies returned to the driveway to issue Ms. Kates a code citation for the shed on her driveway. (Eileen Kates Depo. at 173:14-174:8). She had the shed citation dismissed by the Court when she explained that she had a permit. (Id. at 176:11-15).

On April 11, 2021, Deputy Hammelman went to the Kates Home and told Ms. Kates that he had a warrant for Ryan Kates's arrest. (Id. at 177:14-24, 179:4-12). When Ms. Kates asked to see the warrant, the deputies refused. She asked them to leave her property, and the deputies said, "We'll keep coming back every day." (Pl. Ex. 12, Apr. 11 BWC, at 02:20-03:19).

Three months passed. Then, on July 12, 2021, Deputy Hammelman and another deputy returned to the Kates Home pursuant to a second investigation of Ryan Kates about the gas station battery. (Hammelman Depo. at 96:17-20). After the deputies' knocks at the door were initially unanswered and they found two children in the shed on the front driveway, the deputies knocked on the front door of the Kates Home again. (Pl. Ex. 13, July 12 BWC, at 00:00-05:00). After Deputy

15

Hammelman said that he might call the Department of Children and Families because the children had been left unsupervised in the shed, Ms. Kates opened a window and told the deputies she would bring the children inside. (Id. at 9:00-10:10). Deputy Hammelman then asked Ms. Kates if Ryan Kates was in the home or if she knew where he was. Ms. Kates responded in the negative. (Id. at 9:30-10:10).

On July 15, 2021, Deputy Nguyen went to the Kates Home. No one answered the door, and he left his card. Ms. Kates saw this on her security camera and knew she didn't have to answer the door, so she waited for Deputy Nguyen to leave, and then went outside and grabbed his card. (Nguyen Depo. at 14:23-15:2; Eileen Kates Depo. at 193:10-19).

On July 24, 2021, Deputy Nguyen again attempted to locate Ryan Kates at the Kates Home in relation to the investigation of the battery at the gas station. (Nguyen Depo. at 16:16-17:4; Beaman Affidavit at Ex. A at 39). Mr. DeSimone answered the door and spoke to the deputies outside the Kates Home. Deputies asked to speak to Ryan Kates as they were still investigating the battery. (Nguyen Depo. at 23:17-23 & Ex. 1).

Ms. Kates does not remember any member of PSO using the words "Intelligent [Led] Policing" during the PSO Contacts. (Eileen Kates Depo. at 26:3-7). During the PSO Contacts, no PSO employee ever physically stopped Ms. Kates from closing the front door. (Id. at 201:13-17). Likewise, during the PSO Contacts, no PSO employee ever physically stopped Ms. Kates from going back into her home nor did they ever order her not to go back into her home. (Id. at 201:18-22; 203:4-6). During the PSO Contacts, no PSO employee ever physically forced Ms. Kates out from inside her home. (Id. at 201:23-202:1). Ms. Kates did not contact anyone from PSO to complain about any of the deputies' actions during the PSO Contacts. (Id. at 206:3-7).

Ryan Kates was never labeled a prolific offender by PSO. (Beaman Affidavit at ¶ 5). PSO records do not show any instance in which a prolific offender check was performed at the Kates Home. (Id. at ¶ 6). Rather, the PSO "records were all related to calls for service, county ordinance violations, criminal investigations, or the search for a person with an arrest warrant." (Id. at ¶ 7).

Now, Sheriff Nocco seeks summary judgment on all Ms. Kates's claims. (Doc. # 63). Ms. Kates has responded (Doc. # 87), and Sheriff Nocco has replied. (Doc. # 92). The Motion is now ripe for review.

## II.  **Legal Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude a grant of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (citing Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993)). A fact is material if it may affect the outcome of the suit under the governing law. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997). The moving party bears the initial burden of showing

the Court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1260 (11th Cir. 2004) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).

"When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (quoting Celotex, 477 U.S. at 324).

If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true and all reasonable inferences must be drawn in the non-moving party's favor. Shotz v. City of Plantation, 344 F.3d 1161, 1164 (11th Cir. 2003). If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, the Court should not grant summary judgment. Samples ex rel. Samples v. City of Atlanta, 846

19

F.2d 1328, 1330 (11th Cir. 1988). But, if the non-movant's response consists of nothing "more than a repetition of his conclusional allegations," summary judgment is not only proper, but required. Morris v. Ross, 663 F.2d 1032, 1034 (11th Cir. 1981).

**III. Analysis**

A municipality can only be liable for an employee's unconstitutional action if the action is directly caused by the municipality. Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 690 (1978). "[T]o impose [Section] 1983 liability on a municipality, a plaintiff must show: (1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." McDowell v. Brown, 392 F.3d 1283, 1289 (11th Cir. 2004).

"Simple respondeat superior or vicarious liability will not attach under [Section] 1983." Brown v. City of Atlanta, No. 21-13565, 2023 WL 3244833, at *2 (11th Cir. May 4, 2023) (citing City of Canton v. Harris, 489 U.S. 378, 385 (1989)). "It must be the execution of the government's policy or custom

that causes the injury." Id. Stated otherwise, the municipal policy or custom must be "the moving force behind the [constitutional] violation." Gold v. City of Miami, 151 F.3d 1346, 1354 (11th Cir. 1998). "[A] plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown, 520 U.S. 397, 404 (1997).

Here, the complaint alleges that Sheriff Nocco's official policy — the ILP Program — was the cause of Ms. Kates's injuries. See, e.g., (Doc. # 1 at 18) ("As a result of the [PSO] ILP Program's official policy mandating 'Prolific Offender Checks,' Ms. Kates has been the victim of repeated warrantless searches on and of her property at all hours of the day and night."). More specifically, Ms. Kates alleges that she was subject to the PSO's allegedly unlawful ILP Program — particularly its "prolific offender checks" — because her son Ryan was designated by the PSO as a "prolific offender."

21

The complaint makes this causation theory very clear at multiple points. For example, in her equal protection claim, Ms. Kates alleges: "Ms. Kates has been discriminated against and treated differently by the [PSO] **because** her son, Ryan, is a target of the [PSO] based on the ILP Program's crude algorithm's determination that Ryan is a 'prolific offender.'" (Id. at 23) (emphasis added); see also (Id. at 18) ("As a result of the [PSO] ILP Program's official policy mandating 'Prolific Offender Checks,' Ms. Kates has been the victim of repeated warrantless searches on and of her property at all hours of the day and night."); (Id. at 1) ("[PSO] has adopted and implemented a self-titled 'Intelligence-Led Policing Program' ('ILP Program') which attempts to predict future criminal offenders. The ILP Program identifies 'prolific offenders' based upon a crude algorithm created by the [PSO]. These individuals and their families are subjected to harassment, pretextual and arbitrary law enforcement, and baseless punishment."); (Id. at 5) ("Once an individual becomes an official target of the ILP Program, [PSO] deputies begin to focus their efforts on the individual, collecting as much information as possible, monitoring and tracking the

22

individual's whereabouts and associations, and conducting 'Prolific Offender Checks' with the target frequently as a show of force and deterrent."); (Id. at 6) ("Ms. Kates has been subjected to myriad 'Prolific Offender Checks.'"); (Id. at 11) ("Per ILP Program guidelines, [PSO] deputies are to utilize the warrantless searches conducted as part of 'Prolific Offender Checks' to determine a basis for selective code enforcement against targets and their associates."). In the complaint's prayer for relief, Ms. Kates seeks a declaratory judgment that, among other things, "the ILP Program is unconstitutional because it unjustly punishes friends and family members of 'prolific offenders,' in violation of the Freedom of Association Clause of the First Amendment" and "because it uses a crude algorithm to develop a list of 'prolific offenders' without notice to the purported 'prolific offender' in violation of the Due Process Clause of the Fourteenth Amendment." (Id. at 24).

Sheriff Nocco argues, among other things, that Ms. Kates cannot establish that the ILP Program — as outlined in the ILP Manual — was the "moving force" behind the alleged constitutional violations in this case. (Doc. # 63 at 12-14).

23

He emphasizes that "[t]he record contradicts that assertion as Ryan Kates was never identified by PSO as a 'prolific offender' and instead the record shows that PSO's contact with [Ms. Kates] were related to her son Ryan Kates's being the suspect of multiple criminal investigations and a warrant for his arrest." (Id. at 13). Indeed, it is now undisputed that the PSO never designated Ryan Kates (or Ms. Kates) as a "prolific offender" and, thus, no "prolific offender checks" were performed on the Kates Home. (Beaman Affidavit at ¶¶ 5-6).

In response, Ms. Kates insists that the ILP Program, as outlined in the ILP Manual, was the "moving force" behind the alleged constitutional violations because "[i]n conducting repeated home visits and issuing pretextual code citations, PSO deputies followed PSO **practices**" and "the ILP **philosophy**." (Doc. # 87 at 24) (emphasis added). In essence, Ms. Kates now insists broadly that "ILP tactics were used against" her as a custom or practice, rather than arguing that Ryan Kates was a "prolific offender" officially subject to the ILP Program policy as she had alleged in her complaint. (Id. at 22).

24

The Court agrees with Sheriff Nocco that Ms. Kates has not established that the ILP Program was the "moving force" behind the alleged constitutional violations. Ms. Kates was the master of her complaint, and she chose to structure her claims around her son's being designated a "prolific offender" (and, thus, subject to the ILP Program).[1] This she cannot alter now: "A plaintiff may not amend her complaint through argument in a brief opposing summary judgment." Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1315 (11th Cir. 2004); GeorgiaCarry.Org, Inc. v. Georgia, 687 F.3d 1244, 1258 n.27 (11th Cir. 2012) ("After arguing before the District Court on numerous occasions that they did not have to allege a constitutionally impermissible burden on a sincerely held religious belief, Plaintiffs chose to include additional facts with their motion for summary judgment. These additional facts do not appear in the Amended Complaint. It is well-settled in this circuit that a plaintiff may not amend the complaint through argument at the summary judgment phase

---

[1] Nearly a year after the deadline to amend and a month after the close of discovery, Ms. Kates moved to amend the complaint. (Doc. # 57). The Court denied the motion. (Doc. # 60).

of proceedings."), <u>abrogated on other grounds by</u> <u>New York</u>
<u>State Rifle & Pistol Ass'n, Inc. v. Bruen</u>, 142 S. Ct. 2111
(2022); <u>Fisher v. Metro. Life Ins. Co.</u>, 895 F.2d 1073, 1078
(5th Cir. 1990) (stating that an allegation of improper
benefits calculation not raised in the second amended
complaint but in response to a summary judgment motion is not
properly before the court).

In short, Ryan Kates was never a "prolific offender" who
— by that designation — became a subject of Sheriff Nocco's
ILP Program, along with his family members. Thus, because he
was not a "prolific offender" under the ILP Program and no
"prolific offender checks" were performed at the Kates Home
as Ms. Kates alleged, Ms. Kates cannot prove that the policy
of the ILP Program was the "moving force" behind her injuries.
Summary judgment is warranted on this basis alone.

Alternatively, even if the Court were to ignore that Ms.
Kates structured her claims explicitly around her son's
alleged "prolific offender" status in challenging the ILP
Program, Ms. Kates has still failed to show a genuine dispute
as to whether the ILP Program was the "moving force" behind
her injuries. In her response, Ms. Kates emphasizes that the

2018 ILP Manual applies to a category of "problem people" that is broader than "prolific offenders." (Doc. # 87 at 3-4, 22). She argues for the first time that Ryan Kates was designated a "problem person" subject to the ILP Program "due to his active warrant." (Id. at 18). As mentioned previously, Ms. Kates also broadly complains about "tactics" described in the ILP Manuals that she alleges were used on her. (Id. at 21-22).

There are multiple problems with Ms. Kates's argument. First, some of the "tactics" of the ILP Program she identifies from the ILP Manual are only discussed in relation to "prolific offenders" — not "problem people." For example, the 2018 ILP Manual does not state that the PSO "relentlessly pursu[es]" "problem people," as Ms. Kates suggests. (Id. at 4, 22). Rather, the 2018 ILP Manual states in a subsection entitled "Prolific Offenders" that "relentless pursuit" is used on "prolific offenders" if they do not "stop committing crimes and become a productive member of society." (Doc. # 64-2 at 16-17).

As for the "tactic" of "issuing citations for 'county code violations' at locations where officers 'suspect[]

27

illegal activity'" (Doc. # 87 at 22), this "tactic" is limited by the 2018 ILP Manual. The 2018 ILP Manual specifies, in a section called "Nuisance Abatement," that PSO officers should "[a]ssess the location [of suspected illegal activity] for the existence of county code violations, and **when applicable**, cite the owner/tenant." (Doc. # 64-2 at 30) (emphasis added). No mention of "problem people" is made in this sentence. Thus, the ILP Manual does not direct officers to issue code citations to the family members of "problem people" and, furthermore, it acknowledges that code citations are not always "applicable."

Next and more importantly, Ms. Kates has presented insufficient evidence that Ryan Kates fell within any of the sub-categories of "problem people" subject to the ILP Program during the relevant time. True, many of the PSO visits to Ms. Kates's home were precipitated by Ryan Kates's outstanding warrant for a charge of aggravated stalking. (Hammelman Depo. at 42:9-16, 80:9-13; Eileen Kates Depo. at 156:11-19, 173:14-174:8, 177:14-24, 179:4-12). Notably, however, the 2018 ILP Manual does not say that all individuals with active warrants are "problem people" subject to the ILP Program. Rather, it

designates only those who are "priority warrants" or who have been designated by the PSO as a "district target" in part because they have active arrest warrants. (Doc. # 64-2 at 17, 21). And there is insufficient record evidence to create a genuine dispute as to whether Ryan Kates was ever designated by the PSO as a "problem person," such as a "priority warrant." As Sheriff Nocco points out, "none of the records related to Ryan Kates uses the term 'priority warrant' nor is there any testimony to support this argument." (Doc. # 92 at 2 n.1). Likewise, Ms. Kates has not presented any evidence or testimony identifying Ryan Kates as a "problem person" generally or any sub-type of problem person, such as a "district target."

At most, there is some evidence suggesting that certain resources often utilized for the ILP Program were used in the search for Ryan Kates while he was wanted for aggravated stalking. Although the March 20 BOLO has the heading "Pasco Sheriff's Office/ Intelligence-Led Policing/ Chris Nocco, Sheriff," nothing in the BOLO identifies Ryan Kates as a "problem person." (Doc. # 87-3). The BOLO states that there is probable cause to arrest Ryan Kates for aggravated

stalking, but it does not state that there is a "priority warrant" for his arrest or that he had otherwise been designated as a "district target" or other term. (Id.).

Nor is the internal email, instructing PSO deputies to "coordinate efforts between day/night shifts and STAR so that there is consistent pressure" on the Kates Home, sufficient evidence that Ryan Kates was a "problem person." (Doc. # 87-2 at 3). At most, this email suggests that a STAR team was assisting with the PSO's attempts to execute the arrest warrant for Ryan Kates. The email does not suggest that Ryan Kates was a "problem person" or even that a STAR team oversaw the search for him. Indeed, it appears that members of a STAR team were only present for the latter portion of the April 4 visit to the Kates Home, and none were present for the other PSO Contacts. Furthermore, while the 2018 ILP Manual states that STAR teams are expected to "regularly develop missions to target the priority offenders who impact crime within the STAR boxes," it does not state that STAR teams solely work on cases involving "priority offenders" or "problem people." (Doc. # 64-2 at 66-67). Thus, the involvement of certain STAR team members in searching for Ryan Kates or during the April

30

4 contact with the Kates Home does not indicate that Ryan Kates was ever designated as a "problem person" by the PSO.

Regardless, even if Ryan Kates had been a "prolific offender" or "problem person," the evidence shows that the ILP Program policy of performing checks on such individuals was not the "moving force" behind the visits to the Kates Home. Indeed, according to PSO records, none of the PSO Contacts at the Kates Home "were related to a prolific offender check." (Beaman Affidavit at ¶ 6). Rather, most of the March and April 2021 visits to the Kates Home occurred because Ryan Kates was suspected of and eventually an arrest warrant was issued for aggravated stalking, and the Kates Home was his listed address. (Hammelman Depo. at 42:9-16, 80:9-13 & Ex. A at 153; Eileen Kates Depo. at 156:11-19, 173:14-174:8, 177:14-24, 179:4-12). The April 4, 2021, visit to the Kates Home was initiated because Ms. Kates's grandson called the PSO asking for assistance to gather his clothes from the home. (Brant Depo. at 111:12-16; Eileen Kates Depo. at 166:21-169:1). That the PSO officers also looked around the property for ordinance violations or inquired after Ryan Kates, for whom there was an active felony arrest warrant,

during the April 4 visit does not render the ILP Program the moving force behind that visit. Deputy Brant, who was present during the April 4 visit, testified that the implementation of the ILP Program did not affect his actions at the Kates Home during this contact. (Brant Depo. at 112:12-23).

After Ryan Kates turned himself in on the warrant in early June 2021, the visits to the Kates Home stopped until July 12, 2021. (Hammelman Depo. at 96:17-20; Ryan Kates Depo. at Ex. 16). The cessation of contact with the Kates Home after Ryan Kates turned himself in supports that the purpose of the PSO contacts in March and April was not an ILP Program-based desire to harass Ms. Kates.

Turning to the three PSO contacts that took place on July 12, 15, and 24 of 2021, there is no possibility that the ILP Program was the "moving force" behind the alleged constitutional violations for these contacts for two reasons. First, there is no genuine dispute as to whether PSO deputies went to the Kates Home in July 2021 because of the ILP Program in effect at that time. They did not. Ryan Kates was a suspect in the battery that occurred on July 11, 2021, at a gas station. (Hammelman Depo. at 96:17-20). He was a suspect

because the paper tag the victim pulled from the offender's car as the offender fled showed that the car belonged to Ms. Kates. (Ryan Kates Depo. at Ex. 19 at 7-8). Ryan Kates also arguably matched the description of the offender. (Id.). This evidence uncovered in the investigation of a battery, rather than the ILP Program as outlined in the 2021 ILP Manual, was the "moving force" for the PSO officers' visits to the Kates Home in July 2021.

Second, the 2021 ILP Manual went into effect before these three contacts and, thus, memorialized the official policy of the PSO at that time. Again, the 2021 ILP Manual makes no mention of "problem people." (Doc. # 64-3). Rather, it only mentions "prolific offenders" twice (Id. at 8, 14) — a category that undisputedly never included Ryan Kates. Thus, there was no ILP Program policy in effect in July 2021 to run checks on "problem people" or harass their family members.

**IV.  Conclusion**

No genuine dispute of material fact exists as to whether the ILP Program was the moving force behind any of Ms. Kates's alleged constitutional violations. Thus, Sheriff Nocco is entitled to summary judgment on all claims. Because of this

33

flaw with Ms. Kates's claims, the Court need not analyze whether any constitutional violations occurred.

Finally, the Court's conclusion that the ILP Program was not the moving force behind the alleged constitutional violations should not be interpreted as approval of the ILP Program in general or of how the PSO officers behaved toward Ms. Kates here.[2]

Accordingly, it is hereby

**ORDERED, ADJUDGED,** and **DECREED:**

(1)   Defendant Sheriff Chris Nocco's Motion for Final Summary Judgment (Doc. # 63) is **GRANTED.**

(2)   Summary judgment is granted in favor of Sheriff Nocco and against Plaintiff Eileen Kates on all counts of the complaint.

(3)   The Clerk is directed to enter judgment accordingly and, thereafter, **CLOSE** this case.

---

[2] The Court notes that an earlier-filed case challenging the constitutionality of the ILP Program remains pending, Taylor et al v. Nocco, 8:21-cv-555-SDM-CPT (M.D. Fla. 2021). The plaintiffs in Taylor were designated by the PSO as "prolific offenders" or are the family members of "prolific offenders."

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this

<u>13th</u> day of September, 2023.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE

35